### STATE *v.* NORTHUMBERLAND.

Whether there would be such access to a bridge over a river by public highways as to make it of public utility, and therefore subject the town to indictment for not building it, is a question of fact for the jury; and where the highway upon one side terminated at the distance of eighty rods from the river, without any dwelling-houses or other buildings upon it, although the land through which such highway passed was cultivated, and part of a farm upon the other side of the river;—*Held*, that the court could not say that the want of such bridge would or would not be a nuisance.

The right by necessity to pass upon the adjoining land when a public way is suddenly obstructed, is but temporary, and gives the public no permanent easement in such adjoining land.

INDICTMENT, for neglecting to rebuild and keep in repair a bridge across the Ammonoosuc river, from May 1, 1845, to the time of finding the indictment, which was November term, 1862.

It appeared in evidence, or was admitted, that from 1812 to 1845 there was a public highway along the Connecticut river, and through the town of Northumberland, which crossed the Ammonoosuc river at the place described in the indictment, and that during all that period a bridge had been maintained there as part of said public highway; that during the year 1845 the bridge was carried away, and another one erected about twenty-six rods above, over the same stream, and the road changed for some distance to higher ground, and the latter bridge stood until 1857.

The defense was that the want of a bridge at the old spot could not be regarded as a nuisance, because there was no existing highway leading to it, by means of which a bridge there could be used.

Upon that point it appeared that at about eighty-five rods northerly of the point in question the road came to the bank of the Connecticut river at a sharp bend in its course, at which point the river, during the period between 1812 and 1845, had been gradually encroaching upon the highway, causing it to be removed from time to time further inland, until, by the year 1845, the whole bed of the river, which is there about sixteen rods wide, was changed to the east of where it was in 1812, leaving the site of the road, as it then existed, now on the other side of the river, in Vermont.

In 1845 the old bridge was carried away, and the road at this bend undermined and washed away; and for the purposes of this

case it is conceded that the new road across the Ammonoosuc river, twenty-six rods above the old one, run into and united with the old one at the bend, a short distance, about 41⅔ rods above where it was so cut off by the river, leaving the space of 41⅔ rods between the end of the old road at that point, and the place where the new road came to the river bank, over which space the road has not been renewed or traveled since 1845.

On the part of the State it was contended that, as the river encroached upon the highway at this bend, the town had the right by necessity to construct the road on the bank remaining, and that the easement still exists along on the bank remaining, although over the space of 41⅔ rods as aforesaid the right was not used since 1845.

The town, on the other hand, contended that, the whole road at that point being carried away, no right of way existed upon the present bank; and therefore that there was no public highway by which the bridge, if erected, could be used; and the town also contended that the right of way was lost by abandonment, it not having been used since 1845.

It appeared that the distance from the site of the old bridge to where the road was so cut off in 1845 is eighty-five rods, extending through a meadow under cultivation, and comprising part of a farm lying on the Ammonoosuc and Connecticut rivers, at their junction, belonging to John Eames, who lives in Northumberland, on the south side of the Ammonoosuc river, at the point indicated on the plan, but that there are no houses or other buildings on this part of the road, from the old bridge site to said bend; although said Eames has a barn on said farm on the north side of said Ammonoosuc river, 162 rods easterly of the old road. The entire tract of land of said Eames on the north side of the Ammonoosuc river, lying as shown upon the plan, is about one hundred acres, two thirds of which is cleared and used as mowing, but is rather a low meadow, and inconvenient to cross with teams, except in dry seasons of the year.

The hay produced on this meadow is not of a very good quality, but in quantity a fair crop, and the said Eames has occasion to use it, or some of it, at his barns near his residence. Before the bridge was carried away, some of the hay was taken across one of the bridges aforesaid, and some of it, after being deposited in the barn on that tract, was taken directly across the Ammonoosuc river in the winter.

In the years 1861 and 1862 the said Eames drew considerable quantities of hay from this lot to his residence, coming on to the road between the bridge and said bend of the Connecticut river, and then round by the railroad depot to his house, a distance of about five miles—the distance from the old bridge site to his house by the old road being about one mile. In 1861 he drew fifteen large loads, and in 1862 ten large loads, with four oxen, or four horses. This hay was drawn in the summer, and was drawn over said meadow to the road near the bend, and some of it from the land near the barn.

For the purpose of raising the questions of law a verdict was

taken by consent against the town, subject to the opinion of the court upon the foregoing case; with the provision that if the town shall desire to try the question of abandonment by the jury, after the opinion of the court is made known, the verdict shall be set aside for that purpose; in which case it shall be open to the State to contest the position that there was a space of 41⅔ rods between the end of the old road as cut off, and the place where the new one struck the bank, as conceded, for the purposes of this case. At the hearing, the parties may refer to the plan of Mr. Bucknam, used on the trial; with the further provision, that the question whether the road now existing on the north side of the Ammonoosuc river is of such extent and utility as to render the want of the bridge a nuisance, may be reserved for trial by the jury, and the verdict set aside for that purpose, unless, in the opinion of the court, it would avail nothing.

*Ossian Ray*, Solicitor, with whom was *Heywood*, for the State.

*Burns & Fletcher*, for the respondent.

BELLOWS, J. Laying out of the case, for the present, the alleged way of necessity around the bend, one question is, whether a bridge at the place in question would be so connected with other public highways as to be convenient and useful to the public, so that the neglect to build or repair it would be a nuisance. If the bridge, when erected, would be of no public utility or convenience, then the failure to erect it would not be a nuisance. *State* v. *Canterbury*, and *State* v. *Boscawen*, 28 N. H. 225; *State* v. *Rye*, 35 N. H. 380. The case, then, is this: On the south side of the bridge site is clearly a public highway leading to it, and on the north side is also a public highway, extending eighty-five rods, through a meadow under cultivation, but upon which there is no house or other buildings — the meadow consisting of about one hundred acres, and composing part of the farm of one Eames, who resides upon the south side of the river; and the evidence tended to show that in transporting the products of this meadow to his farm, house and barns, the said Eames had occasion to use this highway on the north side of the river and the bridge at the point in question; but there was no evidence of any occasion to use either for any other purpose. Whether a bridge, if erected, would be so connected with public highways as to be useful and convenient to the public, is a question of fact for the jury, and unless they could not legally have so found it on this evidence, the verdict must stand.

The objection appears to be, that to this eighty-five rods of highway no one would have access, legally, from the northerly side of the river but the owner of this farm; and yet we think it does not, on that account, necessarily lose the character of a public highway. The nature of this use is the same, though probably less frequent, as if his dwelling-house was upon this part of the highway; and although no others might have the right to use it at all, except by virtue of a license to cross his land, yet it has not ceased

to be a public highway, nor has his right to use it as such been taken away. Had this road on the north side of the river been cut off at the distance of one mile instead of a quarter part of that distance, but had still passed several farm-houses, though without connecting with any other road, still the nature of the occasion to use it would have been the same; that is, confined to those owning land upon it, and such as they might permit to cross such land. In such a case the road remaining must have been regarded as a public highway which the inhabitants living upon it, and all others who could gain access to it, would have the right to use, and which the town would be bound to keep in repair, and of course would be liable for damages happening in the use of it, so long as such way was not discontinued. So it would be in respect to the road in question, on both sides of the river; and so long as this duty exists in respect to the road, the same duty must exist in respect to the bridge. It is true that in this case the evidence shows but one person who has occasion to use this bridge; and such may be the case in respect to some roads laid out for the accommodation of individuals; and yet, when so laid out, they become public highways which the town is bound to repair. *Proctor* v. *Andover*, 42 N. H. 348. In such a case we think it would be no defense to an indictment for not building a bridge that but a single individual had occasion to use the road that led to it. So in the case before us. There is a public highway on each side of the river, and leading to the bridge, which every body has a right to use, although but one person has legal access to the part on the north side from that side, and he only is shown to have occasion to use it. Still it stands much like the case of a road laid out for private accommodation; and we think it can not be held, as a matter of law, that the bridge would be of no public use or convenience.

In *State* v. *Rye*, before cited, the court held that if the public had no means of access to the road and no occasion by and upon which they could use the new highway, it could be no nuisance not to build it and keep it in repair. At the same time it is laid down that the jury might have found the highway useful and convenient for the public, with the means of approach only from its eastern terminus, although the land through which it passed was only an uninhabited pasture.

Another question that may arise is, whether a right of way, by necessity, still exists around the bend in the Connecticut river. It seems to be well settled that where a public highway becomes temporarily obstructed and impassable by reason of a flood, a heavy snow-drift, the falling of a tree, or the like, the passenger may pass around such obstructions upon the adjoining land. But this is upon the ground of necessity, and gives to the public no permanent easement around such adjoining land. In the case before us the entire bed of the road has been cut off by the encroachments of the river; and a traveler who had unexpectedly found his course arrested by the sudden and violent destruction of the way, would have been justified in turning into the adjoining land, doing as little damage as possible, in order to pursue his journey. So far the authorities

would sustain him, but merely upon the ground of necessity, and when that necessity no longer existed, the right to go *extra viam* ceased to exist also. This right, indeed, is merely temporary, and designed to enable the traveler, who is suddenly and unexpectedly obstructed, to continue his journey, but not to give the public a permanent easement in the adjoining land, after notice of this obstruction and an opportunity to seek another outlet. Such a right could not be regarded as included in the easement which has been taken and paid for by the public, and we see no principle by which the public can acquire a permanent easement in the adjoining land which has never been taken for its use. If this right by necessity were to be so extended, then, as a logical result, the land of one over whose land the road was not originally laid, might be taken, and without any compensation, simply because it happened to adjoin that which had been washed away by the floods. The true view, however, is, that where the road-bed is so destroyed, it is incumbent upon the public to seek a new outlet upon due compensation, and until that is done its rights will be suspended.

These general views as to the temporary character of this way of necessity are sustained in *Campbell* v. *Race*, 7 Cush. 408 ; Ang. on Highways, secs. 353–355 ; 3 Kent Com. 424. As to the general doctrine in respect to the right to go *extra viam*, see 1 Saund. 323, n. 3 ; *Taylor* v. *Whitehead*, Doug. 745 ; *Bullard* v. *Harrison*, 4 M. & S. 387 ; 3 Dane Abr., ch. 79, art. 3, sec. 11.

Should it turn out, upon further examination, that since 1812 the public had acquired by user another right of way around this bend instead of the one existing at that time, and that this road-bed had, although undermined, still remained in this state, the duty of the town to rebuild and keep it in repair would continue, we think, so long as the road was not discontinued, and would not be affected by the fact that it was difficult or expensive. Under such circumstances it would be no defense to this indictment that access to the bridge was cut off, because it would have been occasioned by a neglect of duty by the town itself.

These views render it unnecessary to consider the question of abandonment, although it would seem that the easement would not be lost by *non-user* for any period less than twenty years, however it might be if the *non-user* existed for that time. *Webber* v. *Chapman*, 42 N. H. 326–335.

Should the respondent elect to go to the jury on the question whether the neglect to rebuild the bridge is a nuisance, there should be taken into consideration the means of crossing, without such bridge, by fording or otherwise ; the occasion there would be to cross at that point ; whether it would be frequent and continued, or only exceptional and rare ; or of a character so trifling as to be of no substantial importance ; whether the bridge would be so connected with other public highways, to which there is access, that it would be of public utility and convenience ; and whether the want of access, if it exists, is caused by the fault of the town in not keeping in repair the highways leading to the bridge. The respondent, having elected a trial by the jury, as provided in the case, the

*Verdict is set aside.*